*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOHNNY WAYNE DAVIS,

Defendant-Appellant.

UNPUBLISHED
April 21, 2022

No. 353689
Wayne Circuit Court
LC No. 15-006182-03-FC

Before: JANSEN, P.J., and SAWYER and RIORDAN, JJ.

PER CURIAM.

In 2016, a jury convicted defendant of second-degree murder, MCL 750.317, first-degree home invasion, MCL 750.110a(2), and torture, MCL 750.85. The trial court sentenced defendant as a third-offense habitual offender, MCL 769.12, to consecutive prison terms of 27 to 40 years for murder and 20 to 40 years for home-invasion, and a concurrent prison term of 20 to 40 years for torture. In a prior appeal, this Court affirmed defendant's convictions and sentences. *People v Davis*, unpublished per curiam opinion of the Court of Appeals, issued September 14, 2017 (Docket No. 332009). In 2019, defendant filed a motion for relief from judgment, which the trial court denied. Defendant now appeals that decision by delayed leave granted. *People v Davis*, unpublished order of the Court of Appeals, entered September 8, 2020 (Docket No. 353689). We affirm.

## I. BACKGROUND

In 2015, defendant and two codefendants, Chiram Armstead and Kyle Kelly, broke into a motel room and demanded money from the motel guest, Eleanor Blevins. When Blevins denied having any money, codefendant Armstead fatally strangled and beat her. Afterward, the three intruders took items from the room and fled. Much of the incident was captured on the motel's surveillance video, and also recorded on a 911 call that Blevins made as the intruders were attempting to gain entrance into the room. This Court summarized the underlying facts in its prior opinion as follows:

Defendant's convictions arise from a brutal attack on the victim, Eleanor Blevins, after a group of three men broke into her motel room. On the evening of

-1-

July 4, 2015, defendant, Chiram Armstead, and Kyle Kelly arrived at the Victory Inn in Detroit and began pounding on the windows and doors of a motel room there. As the three men were attempting to break into her motel room, the victim called 911 requesting assistance. Eventually, Armstead was able to push open a window. Armstead entered the room, opened the door, and the other two followed him in, while the victim remained on the phone with 911.

A recording of the 911 call was played for the jury and indicated that, shortly after gaining entrance, someone asked the victim for money. When the victim responded that she did not have any money, the person told her that she "got to die then." At that point, Armstead began to beat severely the victim and strangle her, eventually causing her death. Much of what happened was recorded on the motel's video surveillance system. Videos from this system were played for the jury and indicated that not only did defendant remain in the room during the attack, he also positioned himself in the doorway so as to block the victim's exit. At some point in the attack, the victim's wig fell off of her head. Surveillance video shows that defendant picked up the wig and wiped the door handle with it. The video shows defendant and the other two perpetrators leaving with bags from the victim's motel room.

Defendant admitted that he was present for the attack, but testified that he believed the room was rented to Armstead and the items taken from there belonged to Armstead. Defendant also argued that he tried, albeit unsuccessfully, to break up the fight. Defendant admitted that he used the wig to wipe away trace evidence, but averred that he did so because he did not want to be liable for damage to the room.

\* \* \*

Although the evidence identified Armstead as the person who primarily attacked the victim, the prosecution argued that defendant was guilty of first-degree murder, home invasion, and torture, under an aiding or abetting theory. The jury acquitted defendant of first-degree murder, but convicted him of the lesser included offense of second-degree murder, as well as the charged offenses of first-degree home invasion and torture. [*Davis*, unpub op at 1-2 (footnote omitted).]

II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant first argues that the trial court erred by denying his motion for relief from judgment on the basis that he was denied the effective assistance of counsel at trial. We disagree.

"We review a trial court's decision on a motion for relief from judgment for an abuse of discretion and its findings of facts supporting its decision for clear error." *People v Swain*, 288 Mich App 609, 628; 794 NW2d 92 (2010). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes, or makes an error of law." *Id.* at 628-629 (citations omitted).

"To demonstrate ineffective assistance of trial counsel, a defendant must show that his or her attorney's performance fell below an objective standard of reasonableness under prevailing professional norms and that this performance caused him or her prejudice." *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013). "To demonstrate prejudice, a defendant must show the probability that, but for counsel's errors, the result of the proceedings would have been different." *Id*. "A defendant must meet a heavy burden to overcome the presumption that counsel employed effective trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009).

## A. FAILURE TO CALL A FORENSIC PATHOLOGY EXPERT

Defendant argues that trial counsel should have consulted with and retained an expert to counter the medical examiner's testimony that Blevins's cause of death was strangulation or blunt force trauma to her head, and that she would have died from her injuries within two to five minutes. Defendant hypothesizes that if a forensic pathology expert had been consulted and retained, the expert may have concluded that "other factors may have caused [Blevins's] death such as how the police handled her or how the EMS handled her."

"An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *Payne*, 285 Mich App at 190. Counsel has wide discretion in matters of trial strategy. *People v Heft*, 299 Mich App 69, 83; 829 NW2d 266 (2012). A claim of ineffective assistance of counsel premised on the failure to call a witness is analyzed under the same standard as all other claims of ineffective assistance of counsel. *People v Jurewicz*, 506 Mich 914, 914; 948 NW2d 448 (2020). "[T]he failure to make an adequate investigation is ineffective assistance of counsel if it undermines confidence in the trial's outcome." *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012) (quotation marks and citation omitted).

In this case, trial counsel reasonably could have chosen not to call a forensic pathology expert for various reasons, including that the expert's testimony would have been unsupportive or even harmful to the defense. Initially, although defendant suggests that a forensic pathology expert might have provided exculpatory testimony, he has not demonstrated factual support for this claim, such as by providing an expert witness affidavit indicating what information a forensic pathology expert would have provided, or identifying other evidence of record suggesting that such an analysis could have been helpful. Defendant attempts to establish the factual predicate for this claim with an affidavit from his appellate counsel. In his affidavit, counsel avers that he "contacted two experts in forensic pathology [who] were willing to consult and provide their assistance on a court appointed case," and defendant submitted the curriculum vitae and fee schedules for the two forensic pathologists who were contacted. However, the affidavit does not indicate that any contacted expert offered an opinion of any kind related to this case, let alone an opinion favorable to defendant. Defendant has not shown that he was denied the effective assistance of counsel on the basis of the information in appellate counsel's affidavit. In other words, what defendant and his appellate counsel have provided is not evidence in support of the suggested theory that Blevins could have died from injuries other than those inflicted during the criminal episode. See *People v Lewis*, 305 Mich 75, 78; 8 NW2d 917 (1943) (an attorney's affidavit is insufficient to establish "whether the witnesses referred to can or will testify to the claimed evidence"). Accordingly, there is no competent evidence that either expert witness would have testified favorably for defendant if called. Defendant's mere speculation that an expert might have provided favorable testimony is

insufficient to show that trial counsel's failure to retain an expert was objectively unreasonable, or to show that there is a reasonable probability that the outcome of trial would have been different if an expert had been called. *Payne*, 285 Mich App at 190; *Nix*, 301 Mich App at 207. Consequently, defendant has not demonstrated that trial counsel was ineffective for failing to contact or retain a defense expert.

## B. IMPROPER IDENTIFICATION TESTIMONY

Defendant also argues that trial counsel was ineffective for failing to object when an officer testified that defendant and his two codefendants were depicted in the motel surveillance video. Defendant asserts that the officer's testimony improperly invaded the province of the jury. We disagree.

The following exchange occurred during the prosecutor's direct examination of Detroit Police Officer Joseph Dabliz:

> *Q*. And when you viewed that video, were you able to make any identification of any parties on the video?
>
> *A*. Yes, I did.
>
> *Q*. How many identifications were you able to make?
>
> *A*. Three.
>
> *Q*. And was that based on your past experience in the unit that you worked for?
>
> *A*. Yes.
>
> * * *
>
> *Q*. But the line here on number 11 states it was all one conversation.
>
> *A*. Yeah, but you're not—you're not pointing to what that answer is relevant to. The discussion that came before that.
>
> *Q*. Well, it says conversation.
>
> *A*. That's the simple answer about all that came before—
>
> * * *
>
> *A*. This gentleman right here is Johnny Davis, who is seated at defense table with the checkered shirt on.
>
> * * *
>
> *Q*. And have you had contact with Mr. Davis?

-4-

*A.* Yes, I have.

*Q.* About how many times?

*A.* A handful, five or ten times.

MRE 701 permits lay witnesses to provide testimony in the form of an opinion if the opinion is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." But "a witness cannot express an opinion on the defendant's guilt or innocence of the charged offense[.]" *People v Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013) (quotation marks and citation omitted). For this reason, if a witness is in no better position than the jury to identify a person in a video or still photograph, the witness's opinion testimony identifying a defendant as the individual depicted is generally inadmissible as an invasion of the province of the jury. *Id*. at 52-53. Conversely, if a witness is in a better position than the jury to identify a person depicted in a video or photograph, the lay opinion testimony does not invade the province of the jury. *Id*.; see also *United States v LaPierre*, 998 F2d 1460, 1465 (CA 9, 1993).[1] As this Court observed in *Fomby*, in *LaPierre* the court offered two illustrations of when a lay witness may identify a defendant in a video or photograph at trial without invading the province of the jury. *Fomby*, 300 Mich App at 52. The court in *LaPierre* explained:

> Our cases upholding the use of testimony of this type have been limited to two types. The first type is those in which the witness has had substantial and sustained contact with the person in the photograph. The second type is those in which the defendant's appearance in the photograph is different from his appearance before the jury and the witness is familiar with the defendant as he appears in the photograph. [*LaPierre*, 998 F2d at 1465 (citations omitted).]

The "common thread" binding these types of cases is that "there is reason to believe that the witness is more likely to identify correctly the person than is the jury." *Id.*; see also *Fomby*, 300 Mich App at 52.

In this case, there was evidence that the officer was familiar with defendant, having encountered him 5 or 10 times. In any event, to the extent that trial counsel could have offered an objection on the basis that there was no evidence that Officer Dabliz was substantially familiar with defendant such that he was in a better position than the jury to correctly make the identification, see *Fomby*, 300 Mich App at 52-53, there is no reasonable probability that counsel's failure to object affected the outcome of defendant's trial. Significantly, defendant testified at trial that he was at the scene of the crime, was depicted in the motel surveillance video, and was correctly identified. Defendant argues that, despite his own testimony placing himself at the crime scene, there was no evidence *before* the officer testified that he was there. However, defendant's defense theory, as expressed as early as opening statement before any evidence was presented, was that he was at the crime scene and depicted in the video, but that he was merely present and that

---

[1] "Lower federal court decisions are not binding on this Court, but may be considered on the basis of their persuasive authority." *Fomby*, 300 Mich App at 50 n 1.

he would be testifying regarding his version of the events. Indeed, given this defense theory, defense counsel reasonably may have decided that there was no reason to object to the officer's testimony identifying defendant in the video. Regardless, considering the defense theory asserted at the outset of trial and defendant's own testimony that he was one of the individuals at the crime scene and captured on video, there is no reasonable probability that the officer's opinion testimony about defendant being depicted in the video affected the outcome of defendant's trial. Consequently, defendant cannot establish a claim of ineffective assistance of counsel on this basis.

## C. JURY INSTRUCTIONS

Defendant also faults trial counsel for not requesting an instruction on accessory after the fact as a lesser offense of aiding or abetting. The decision whether to request a lesser offense instruction is a matter of trial strategy. *People v Robinson*, 154 Mich App 92, 93-94; 397 NW2d 229 (1986). MCL 768.32 only permits instruction on necessarily included lesser offenses, not cognate lesser offenses. *People v Reese*, 466 Mich 440, 446; 647 NW2d 498 (2002). A defendant is entitled to a lesser offense instruction only if that lesser offense is included in the greater offense; it must be impossible to commit the greater offense without first committing the lesser offense. *People v Jones*, 497 Mich 155, 164; 860 NW2d 112 (2014).

An accessory after the fact is "one who, with knowledge of the other's guilt, renders assistance to a felon in the effort to hinder his detection, arrest, trial or punishment" and is comparable to obstruction of justice. *People v Perry*, 460 Mich 55, 62; 594 NW2d 477 (1999) (quotation marks and citation omitted). While defendant asserts that accessory after the fact should be considered a lesser offense of aiding or abetting, he acknowledges that the Supreme Court in *Perry* stated that aiding or abetting is not a separate substantive offense, but a theory of the prosecution, and that the same class or category analysis for lesser offenses must be between substantive offenses. *Id*. at 63 n 20, 64-65. Although defendant argues that *Perry* should not control this case, this Court is bound to follow decisions of our Supreme Court that have not been overruled or superseded. *People v Anthony*, 327 Mich App 24, 44; 932 NW2d 202 (2019). Consequently, while defendant seeks to preserve his claim that accessory after the fact is a lesser offense of aiding or abetting, he is not entitled to appellate relief on this basis.

Furthermore, although not addressed by defendant, we note that accessory after the fact is not a lesser offense of any of the substantive offenses in this case, which are murder, home invasion, and torture. In *Perry*, our Supreme Court held that accessory after the fact is not a lesser offense of murder. *Perry*, 460 Mich at 62. Likewise, accessory after the fact is not a lesser offense of either home invasion or torture. The elements of first-degree home invasion are: (1) the defendant broke into and entered a dwelling or entered the dwelling without permission; (2) when the defendant did so, he intended to commit a felony, larceny, or assault, or he actually committed a felony, larceny, or assault while entering, being present in, or exiting the dwelling; and (3) another person was lawfully present in the dwelling or the defendant was armed with a dangerous weapon. *People v Sands*, 261 Mich App 158, 162; 680 NW2d 500 (2004); MCL 750.110a(2). Torture is defined in MCL 750.85(1), which states: "A person who, with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control commits torture . . . ." Simply comparing the elements of the offenses shows that it is certainly possible to commit both torture and home invasion without committing the crime of accessory after the fact. Thus,

because defendant was not charged with the substantive offense of accessory after the fact, and accessory after the fact is not a lesser offense of any of the charged crimes, trial counsel's failure to request the instruction was objectively reasonable. *Nix*, 301 Mich App at 207. Counsel is not required to make a futile request for an inapplicable jury instruction. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Consequently, defendant cannot establish that trial counsel was ineffective for failing to request an accessory-after-the-fact instruction.

### III. JUDICIAL MISCONDUCT

Next, defendant argues that he is entitled to relief because the trial judge's conduct when questioning him at trial denied him a fair trial. While we agree that some of the trial judge's questions and conduct were improper, we do not agree that the challenged conduct entitles defendant to relief from judgment.

"The question whether judicial misconduct denied defendant a fair trial is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). However, because defendant did not object to the challenged conduct in the trial court, we review his claims of judicial misconduct for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 752-753, 763-764; 597 NW2d 130 (1999); *People v Sardy*, 216 Mich App 111, 117-118; 549 NW2d 23 (1996).

A defendant must overcome a heavy presumption of judicial impartiality when claiming judicial misconduct. *People v Jackson*, 292 Mich App 583, 598; 808 NW2d 541 (2011). In determining whether a trial judge's conduct deprives a defendant of a fair trial, this Court considers whether the "trial judge's conduct pierces the veil of judicial impartiality." *Stevens*, 498 Mich at 164, 170. "A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id*. at 171. This is a fact-specific inquiry, and this Court considers the "cumulative effect" of any errors. *Id*. at 171-172. A single instance of misconduct generally does not create an appearance that the trial judge is biased, unless the instance is "so egregious that it pierces the veil of impartiality." *Id*. at 171. In evaluating the totality of the circumstances, this Court should consider a "variety of factors," including

> the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions. [*Id*. at 172.]

Defendant takes exception to the trial judge's questioning of him, claiming that it pierced the veil of judicial impartiality. First, the general nature of this judicial intervention—questioning of a witness by the trial court—is not inappropriate. MRE 614(b); *Stevens*, 498 Mich at 173. Such questioning can "produce fuller and more exact testimony or elicit additional relevant information." *Stevens*, 498 Mich at 173. But "the central object of judicial questioning should be to clarify," and it is inappropriate for a judge to exhibit disbelief of a witness, whether intentional or unintentional. *Id*. at 173-174. Second, the trial judge's tone and demeanor should be evaluated. *Id*. at 174. "A judge must proceed with particular care when engaging with a criminal defendant."

*Id*. at 175. Third, an appellate court should "consider the scope of judicial intervention within the context of the length and complexity of the trial, or any given issue therein." *Id*. at 176. In a longer or more complex trial, judicial intervention may be more appropriate than in a shorter or less complex one. *Id*. And given that a trial judge's objective should be to clarify, "a judge's inquiries may be more appropriate when a witness testifies about a topic that is convoluted, technical, scientific, or otherwise difficult for a jury to understand." *Id*. "Fourth, and in conjunction with the third factor, a reviewing court should consider the extent to which a judge's comments or questions were directed at one side more than the other." *Id*. at 176-177. The presence or absence of a curative instruction is also a factor to take into account. *Id*. at 177.

We agree that some of the trial court's questions and conduct were inappropriate. The judge did ask some questions that were material to issues in the case, were limited in scope, and appeared to seek to provide a fuller explanation to the jury about defendant's testimony. And even if the elicited testimony could be deemed damaging to defendant's case, that fact alone does not demonstrate that the trial court's questioning was improper. *People v Davis*, 216 Mich App 47, 52; 549 NW2d 1 (1996). However, there were also questions that were not asked in a neutral manner, such as when the judge appeared to persistently challenge defendant about his testimony that he did not hear the victim screaming, and when the judge questioned the reasonableness of defendant's actions in response to his belief that codefendant Armstead could not get into what defendant thought was Armstead's room. We cannot determine the judge's demeanor and tone because there was no objection and thus no record was made. And as the trial court pointed out, this was one line of questioning in a complex and lengthy trial. But many questions, on their face, appear to exhibit the judge's disbelief of defendant, which is inappropriate. *Stevens*, 498 Mich at 173-174. Indeed, in response to one of defendant's answers about thinking that the room was codefendant Armstead's room, the judge stated: "Well, that doesn't make any sense to me." Thus, defendant has shown that some of the trial judge's conduct was improper.

However, defendant has not demonstrated that he is entitled to relief from judgment. Whether a judge's conduct pierced the veil of judicial impartiality is evaluated by considering the totality of the circumstances to determine whether it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party. *Id*. at 171. As noted, the judge's questions were material to issues in the case, and many were limited in scope and appeared to seek to provide a fuller explanation of defendant's responses. Indeed, some of defendant's answers were not responsive to the questions asked, and the trial court attempted to clarify what was being asked. To the extent that some of the judge's questions exhibited a disbelief in some of defendant's responses, the judge also instructed the jury that the case must be decided on the evidence only, that his comments, rulings, and questions are not evidence, that he is not trying to influence the vote or express a personal opinion about the case when he makes a comment or a ruling, and that if the jury believes that the court has an opinion, that opinion must be disregarded. Because it is well established that jurors are presumed to follow their instructions, "the presence of a curative instruction does tend to cut against a finding of judicial bias." *Id*. at 190.

Furthermore, to show that defendant is entitled to postconviction relief, he must show actual prejudice, meaning "in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal." MCR 6.508(D)(3)(b)(*i*)(A). We agree with the trial court that defendant cannot establish a "reasonably likely chance of acquittal" under

MCR 6.508(D), i.e., actual prejudice, because "there was ample evidence before the jury to establish the Defendant's culpability."  In its prior opinion, this Court discussed the evidence as follows:

> As the three men were attempting to break into her motel room, the victim called 911 requesting assistance.  Eventually, Armstead was able to push open a window.  Armstead entered the room, opened the door, and the other two followed him in, while the victim remained on the phone with 911.
>
> A recording of the 911 call was played for the jury and indicated that, shortly after gaining entrance, someone asked the victim for money.  When the victim responded that she did not have any money, the person told her that she "got to die then."  At that point, Armstead began to beat severely the victim and strangle her, eventually causing her death.  Much of what happened was recorded on the motel's video surveillance system.  Videos from this system were played for the jury and indicated that not only did defendant remain in the room during the attack, he also positioned himself in the doorway so as to block the victim's exit.  At some point in the attack, the victim's wig fell off of her head.  Surveillance video shows that defendant picked up the wig and wiped the door handle with it.  The video shows defendant and the other two perpetrators leaving with bags from the victim's motel room.  [*Davis*, unpub op at 1-2.]

With respect to defendant's culpability, this Court observed:

> Defendant helped Armstead break into the room and, if he was not the one speaking to Blevins himself, he was present when a codefendant threatened to kill Blevins.  Defendant remained in the room while Armstead assaulted the victim, and defendant crowded the doorway to block the victim's main avenue of escape.  Defendant wiped trace evidence off the door with the victim's wig, and he carried bags of the victim's belongings from the room.  [*Id*. at 5.]

Given the evidence presented at trial, defendant cannot meet the "actual prejudice" requirement set forth in MCR 6.508(D)(3).  Consequently, he is not entitled to any relief from judgment on this basis.

Defendant also argues that trial counsel provided ineffective assistance by failing to object to the trial judge's questioning of him.  We agree that counsel performed deficiently by failing to object.  It was objectively unreasonable for trial counsel not to have objected to intervene to stop the court's questioning of defendant once the questioning became excessive and the court began challenging some of defendant's explanations and responses, or to at least make a record.  However, as explained previously, the record does not support the contention that a reasonable probability existed that, but for counsel's failure to object, the outcome of defendant's trial would have been different.  In addition to the fact that the trial court instructed the jury that it comments, rulings, and questions are not evidence and that the jury was to disregard any perceived opinion by the court about the case, there was very strong evidence to support defendant's culpability in the crimes such that any inappropriate questions by the court would not have made a difference in

the outcome of the trial. *Nix*, 301 Mich App at 207. Therefore, defendant has not established a claim of ineffective assistance of counsel on this basis.

## IV. HABITUAL-OFFENDER NOTICE

Defendant also argues that he is entitled to be resentenced without the third-offense habitual-offender enhancement because he was not given adequate notice of the prosecution's intent to seek an enhanced sentence. We disagree.

MCL 769.12 provides that a person who has been previously convicted of three or more felonies shall be subject to an enhanced sentence if convicted of a subsequent felony. To enhance the sentence of a defendant, the prosecutor must file "a written notice of his or her intent to do so within 21 days after the defendant's arraignment on the information charging the underlying offense or, if arraignment is waived, within 21 days after the filing of the information charging the underlying offense." MCL 769.13(1). The notice must be filed with the court and "be personally served on the defendant or his [] attorney at the arraignment" or in any manner "provided by law or court rule[.]" MCL 769.13(2). The purpose of the notice requirement in MCL 769.13 is to ensure that a defendant has notice at an early stage in the proceedings that he could be sentenced as a habitual offender. *People v Morales*, 240 Mich App 571, 582; 618 NW2d 10 (2000). "The failure to file a proof of service of the notice of intent to enhance the defendant's sentence may be harmless if the defendant received the notice of the prosecutor's intent to seek an enhanced sentence and the defendant was not prejudiced in his ability to respond to the habitual-offender notification." *People v Head*, 323 Mich App 526, 543-544; 917 NW2d 752 (2018). In *Head*, this Court noted that the defendant "received actual notice on the record at the preliminary examination that he was being charged as a fourth-offense habitual offender." *Id*.

Plaintiff does not dispute that a proof of service of the habitual-offender notice was not filed. The trial court assumed there was no proof of service, and there is no indication in the register of actions that a proof of service was filed. As in *Head*, however, the error was harmless because the lower court record reflects that defendant received actual notice of the prosecutor's intent to seek a habitual-offender enhancement, and defendant was not prejudiced in his ability to respond to the habitual-offender notification. The prosecutor filed the charging document on July 10, 2015, more than six months before trial, that contained a notice of defendant's habitual-offender status, including an explanation of the potential effect of habitual-offender enhancement. Defendant does not allege that the prosecutor failed to provide him with a copy of the felony information before he entered a plea, nor does he dispute the validity of the underlying offenses supporting his status as a third-offense habitual offender. Defendant also received actual notice of the prosecution's intent to seek habitual-offender enhancement on the record at the July 24, 2015 preliminary examination. In specific, at the preliminary examination, the court, after listing the charges against each defendant, stated: "Defendant number three, Mr. Davis, is served with a habitual offender third offense notice." Because defendant received actual notice of his habitual-offender status and its potential effect, the prosecutor's error in failing to file a proof of service was harmless. Thus, the trial court did not err by sentencing defendant as a third-offense habitual offender, and defendant is not entitled to relief from judgment on this basis.

## V. SCORING OF OFFENSE VARIABLES

Defendant next argues that he is entitled to resentencing because three of his sentencing guidelines offense variables were erroneously scored. Defendant challenges the scoring of offense variable (OV) 2 (lethal potential of the weapon possessed or used), OV 5 (psychological injury to a member of a victim's family), and OV 7 (aggravated physical abuse). We do not find that defendant is entitled to resentencing.[2]

When reviewing a trial court's scoring decision, the trial court's "factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*.

### A. OV 2

OV 2 "is lethal potential of weapon possessed or used" by a defendant during the commission of the offense. MCL 777.32(1). One point is scored for OV 2 if the defendant possessed or used a potentially lethal weapon other than a harmful substance or device, a firearm, or a knife. MCL 777.32(1)(a)-(e). If "[t]he offender possessed or used no weapon," zero points should be assessed. MCL 777.32(1)(f). It is undisputed that only bare hands were used as a weapon during the commission of the offenses in this case. This Court has held that an offender's bare hands do not qualify as a potentially lethal weapon under MCL 777.32(1)(e). See *People v Hutcheson*, 308 Mich App 10, 17; 865 NW2d 44 (2014). Consequently, as plaintiff concedes, a preponderance of the evidence does not support the trial court's one-point score for OV 2, and no points should have been assigned to OV 2. Therefore, the trial court erred by scoring one point for OV 2.

### B. OV 5

"OV 5 is scored when a homicide or homicide-related crime causes psychological injury to a member of a victim's family." *People v Calloway*, 500 Mich 180, 184; 895 NW2d 165 (2017) (footnote omitted). A score of 15 points is appropriate if "[s]erious psychological injury requiring professional treatment occurred to a victim's family." MCL 777.35(1)(a). "In this context, 'serious' is defined as "having important or dangerous possible consequences." *Calloway*, 500 Mich at 186 (citation omitted). In scoring OV 5, a trial court should consider "the severity of the

---

[2] We note that the trial court stated that defendant's challenges were untimely under MCR 6.429(C). However, MCR 6.429(B)(4) states that "[i]f the defendant is no longer entitled to appeal by right or by leave, the defendant may seek relief pursuant to the procedure set forth in subchapter 6.500." That is what defendant did in this case. In addition, the trial court appears to have overlooked that defendant also raised this sentencing issue in the context of ineffective assistance of counsel claims. Accordingly, the trial court's reasoning for denying this claim is flawed. However, considering defendant's scoring challenges on their merits, we conclude that defendant is not entitled to resentencing.

injury and the consequences that flow from it, including how the injury has manifested itself before sentencing and is likely to do so in the future, and whether professional treatment has been sought or received." *Id.*

At sentencing, three of Blevins's family members made impact statements, expressing anguish, grief, and despair at the loss of their family member. One family member expressed that the family members would be "haunted with [Blevins's] plea for help on that 911 call" for the rest of their lives. In response to the trial court's inquiry, a family member specifically testified that, as a result of what happened to Blevins, family members were seeking mental health treatment with psychiatrists and others. These statements provided a reasonable basis for the court to conclude that Blevins's family members suffered serious psychological injury. Therefore, the trial court did not clearly err by assigning a 15-point score for OV 5.

## C. OV 7

OV 7 addresses aggravated physical abuse. MCL 777.37(1). At the time of defendant's original sentencing, MCL 777.37(1) required an assessment of 50 points if a victim was "treated with sadism, torture, or excessive brutality or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense."[3] In this case, the trial court assessed 50 points for OV 7 on the basis of excessive brutality. A victim is treated with excessive brutality when a defendant treats the victim with "savagery or cruelty beyond even the 'usual' brutality of a crime." *People v Rosa*, 322 Mich App 726, 743; 913 NW2d 392 (2018) (quotation marks and citation omitted).

Defendant argues that his actions individually were insufficient to justify a score of 50 points because he was merely present when the codefendants beat the victim, and "there is no evidence in the record that Mr. Davis participated in, or took part in, or encouraged his co-defendants to engage in sadism, torture, or excessive brutality." As defendant notes, this Court has held that, "[f]or OV 7, only the defendant's actual participation should be scored." *People v Hunt*, 290 Mich App 317, 323-326; 810 NW2d 588 (2010). However, this case is distinguishable from *Hunt*. In *Hunt*, the Court held that "while [the] defendant was present and armed during the commission of the crime here, he did not himself commit, take part in, or encourage others to commit acts" justifying a score of 50 points under OV 7. *Id.* at 325-326. In this case, however, defendant acted congruently with his codefendants, and did not merely take a passive role. There was evidence that defendant himself attempted to break into the victim's motel room by opening the door, helped a codefendant gain entrance through the window, entered the room, crowded the doorway to block the victim's means to escape, all while the victim was being brutally beaten, stomped, and strangled as she was screaming and pleading for help, and he used the victim's bloody wig, which had fallen off her head during the attack, to wipe the room's door handle. See *Davis*, unpub op at 1-2. Thus, even if defendant did not personally brutality attack the victim, the trial court did not clearly err by finding that defendant was actively present, participating, and

---

[3] MCL 777.37(1) was amended by 2015 PA 137, effective January 5, 2016, to insert "similarly egregious" before the word "conduct" in Subsections (a) and (b). The former MCL 777.37(1) applies to this case because defendant committed the sentencing offenses before January 5, 2016.

encouraging the events that the court found constituted excessive brutality under MCL 777.37(1)(a). Consequently, a preponderance of the evidence supports the trial court's 50-point score for OV 7.

## D. RESENTENCING

The trial court scored the guidelines for defendant's convictions of both torture, which is a Class A offense, MCL 777.16d, and first-degree home invasion, which is a Class B offense, MCL 777.16f. Although the trial court erroneously assigned a one-point score to OV 2, this scoring error does not entitle defendant to resentencing because it does not affect the guidelines ranges under which he was sentenced.

For torture, defendant received a total OV score of 191 points, which combined with his 50 prior record variable (PRV) points, placed him in the E-VI cell of the Class A sentencing grid, for which the minimum sentence range is 225 to 562 months for a third-offense habitual offender. MCL 777.62; MCL 777.21(3)(b). The additional one-point score for OV 2 increased defendant's total OV score from 190 points to 191 points, which did not change his placement in OV Level VI (100+ points), and thus had no effect on his guidelines range for torture. For the home-invasion conviction, defendant also received a total OV score of 191 points, which combined with his 50 PRV points, placed him in the E-VI cell of the Class B sentencing grid, for which the minimum sentence range is 99 to 240 months for a third-offense habitual offender. MCL 777.63; MCL 777.21(3)(c). The additional one-point score for OV 2 increased defendant's total OV score from 190 points to 191 points, which did not change his placement in OV Level VI (75+ points), and thus had no effect on his guidelines range for home invasion. Because the scoring error does not affect the appropriate guidelines ranges for these offenses, defendant is not entitled to resentencing.[4] *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006); *People v Biddles*, 316 Mich App 148, 156; 896 NW2d 461 (2016).

## E. INEFFECTIVE ASSISTANCE OF COUNSEL

We also reject defendant's related argument that defense counsel was ineffective for failing to object to the 50-point score for OV 7. As noted, the evidence supports the 50-point score for OV 7. Because trial counsel cannot be deemed ineffective for failing to raise a futile objection, defendant has not shown that counsel's inaction in this regard was objectively unreasonable. See *Ericksen*, 288 Mich App at 201; *Nix*, 301 Mich App at 207. Furthermore, because the scoring of OV 7 did not affect defendant's guidelines range for either offense, defendant cannot establish that he was prejudiced by counsel's failure to object. Consequently, defendant cannot establish that trial counsel was ineffective for failing to object to the scoring of OV 7.

---

[4] Indeed, even if we credited defendant's claims regarding OV 5 and OV 7, removing those points would decrease his total OV score by, at most, 65 points, which would still leave his total OV score still well in excess of the 100 points necessary to place him in the highest category of offense severity. Thus, there would be no effect on his guidelines range for either offense.

## VI. NEWLY DISCOVERED EVIDENCE

Defendant argues that he is entitled to a new trial on the basis of newly discovered evidence in the form of an affidavit from codefendant Armstead that attempts to absolve defendant of any culpability in the charged crimes. We disagree.

We review a trial court's decision on a motion for a new trial for an abuse of discretion. *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003).

### A. CODEFENDANT ARMSTEAD'S AFFIDAVIT

Defendant seeks to establish his "newly discovered" evidence claim with an affidavit from codefendant Armstead. In his affidavit, Armstead averred that he was accompanied by defendant and codefendant Kelly when he went to the motel where he had a room, which he believed was room 133. Armstead, unaware that his room had been switched, tried to use his key, and, when it did not work, he knocked on the door but no one answered. Because of his intoxication, he began to kick the door to gain entrance, and then "smacked the [locked] window" and it broke. When he heard someone scream, it "alerted" him and he thought someone had broken into his room. He then "attacked the person by [him]self" and "was so intoxicated that [he] didn't know what was going on." Armstead claimed that he threatened defendant and Kelly, and instructed them "to get [his] belongings." Defendant tried to stop him, but he pushed defendant away. Armstead believed that defendant and Kelly were "under duress." Armstead concluded:

> This was not a planned act and I acted in the heat of passion. I really thought someone broke in[to] my room and I was not aware that the room was changed. As I come to realize [that] this is wrong so I'm telling the truth that [defendant] and [codefendant Kelly] should not be prosecuted for my mistake and actions.

### B. ANALYSIS

To obtain a new trial on the basis of newly discovered evidence, a defendant must demonstrate that: (1) the evidence itself, not merely its materiality, is newly discovered; (2) the newly discovered evidence is not merely cumulative; (3) the defendant, exercising reasonable diligence, could not have discovered and produced the evidence at trial; and, (4) the new evidence makes a different result probable on retrial. *Cress*, 468 Mich at 692. The trial court's function in evaluating the credibility of new evidence is "limited" because the trial court "is not the ultimate fact-finder . . . ." *People v Johnson*, 502 Mich 541, 567; 918 NW2d 676 (2018). Rather, because the remedy would be a grant of a new trial, the trial court's function is to decide whether a reasonable juror "could find the testimony credible on retrial." *Id*.

Preliminarily, it is questionable whether the information revealed in codefendant Armstead's affidavit constitutes newly discovered evidence. All three defendants' presence at the crime scene was known at the time of defendant's trial, which includes the knowledge that either of defendant's codefendants may have been able to provide information. As plaintiff points out, production of an affidavit from one's codefendant is not newly discovered evidence, but rather newly available evidence, because a defendant presumably already knows what his codefendant

could say. See *People v Terrell*, 289 Mich App 553, 555; 797 NW2d 684 (2010), overruled in part on other grounds by *People v Grissom*, 492 Mich 296, 320; 821 NW2d 50 (2012).

More significantly, however, is that codefendant Armstead's affidavit does not make a different result probable on retrial because no reasonable juror could find his statements credible. Armstead, who is serving a mandatory life sentence, claims that defendant was acting under duress and tried to stop Armstead. However, motel surveillance video contradicts any claim that defendant tried to stop Armstead and, as this Court stated in its prior opinion, the video shows "that not only did defendant remain in the room during the attack, he also positioned himself in the doorway so as to block the victim's exit." *Davis*, unpub op at 1. The surveillance video also showed that when the victim's wig fell off during the attack, defendant picked it up and wiped the door handle with it. *Id*. at 1-2. Armstead's affidavit also advances a scenario of him gaining entrance to a room that he thought was his and attacking a person whom he thought was an intruder. However, both Armstead and defendant completely ignore the 911 recording indicating that shortly after the three men broke into the room, someone asked the victim for money, and, when she responded that she did not have any money, she was told that she had to die before being strangled and viciously beaten. *Id*. at 1. For these reasons, defendant has not demonstrated that the "new evidence" would make a different result probable on retrial. *Cress*, 468 Mich at 692. Consequently, defendant is not entitled to a new trial on the basis of newly discovered evidence, and the trial court did not abuse its discretion by denying defendant's motion for relief from judgment on this basis.

## VII. ACTUAL INNOCENCE

Defendant's claim of actual innocence is predicated on his challenge to the sufficiency of the evidence at trial and the "newly discovered evidence" of codefendant Armstead's affidavit. The "actual innocence" standard is a demanding standard that allows for review in only extraordinary cases. *Swain*, 288 Mich App at 638. To satisfy the actual innocence standard, a defendant must demonstrate that it is more likely than not that no reasonable juror would have found the defendant guilty beyond a reasonable doubt. *Id*. In considering whether a defendant has satisfied the "actual innocence" standard, an appellate court defers to the trial court's assessment of new evidence in the context of a holistic judgment about all of the evidence and its likely impact on the jury adhering to the reasonable doubt standard. *Id*. at 640. All of the evidence, "old and new, incriminating and exculpatory, must be considered[.]" *Id*.

We agree with the trial court that defendant did not show that he is actually innocent. This Court held in its previous opinion that sufficient evidence was presented at trial to support defendant's convictions, stating:

> The evidence clearly established that Armstead committed each of the charged offenses. Armstead broke into the victim's motel room, brutally assaulted her while she was trapped, and stole several of her belongings on his way out. Defendant's culpability in these crimes is equally clear under the record. Defendant helped Armstead break into the room and, if he was not the one speaking to Blevins himself, he was present when a codefendant threatened to kill Blevins. Defendant remained in the room while Armstead assaulted the victim, and defendant crowded the doorway to block the victim's main avenue of escape. Defendant wiped trace

-15-

evidence off the door with the victim's wig, and he carried bags of the victim's belongings from the room. Viewed in a light most favorable to the prosecution, the evidence showed that defendant was not merely present, but was acting in concert with Armstead and shared Armstead's intent to commit the offenses. The evidence was therefore sufficient to support each of defendant's convictions under an aiding or abetting theory. [*Davis*, unpub op at 5.]

In addition, for the reasons discussed in Section VI, *supra*, the information in codefendant Armstead's affidavit does not affect the conclusion that sufficient evidence supports defendant's convictions. In sum, given the evidence presented at trial, and considering Armstead's highly questionable affidavit, much of which is contradicted by objective evidence, the trial court did not err by rejecting defendant's claim for relief on the basis that he is actually innocent.

## VIII. DENIAL OF RELIEF FROM JUDGMENT

Lastly, defendant argues that the trial court abused its discretion by denying his motion for relief from judgment because he was denied the effective assistance of appellate counsel. Again, we disagree. The test for ineffective assistance of appellate counsel is the same as that applicable to a claim of ineffective assistance of trial counsel. *People v Uphaus (On Remand)*, 278 Mich App 174, 186; 748 NW2d 899 (2008). Therefore, a defendant must show that his or her appellate counsel's performance fell below an objective standard of reasonableness and prejudiced his or her appeal. *Id*.

"A defendant in a criminal case may move for relief from a judgment of conviction and sentence." *Swain*, 288 Mich App at 629, citing MCR 6.502(A). Such motions are governed by MCR 6.500 *et seq*. "A defendant has the burden to establish entitlement to relief." *Swain*, 288 Mich App at 630, citing MCR 6.508(D). When the defendant seeks such relief on grounds, other than jurisdictional ones, that could have been raised on appeal, the defendant must satisfy "good cause" for the failure to raise such grounds earlier and "actual prejudice" as a result of the alleged irregularity. MCR 6.508(D)(3)(a) and (b). "The requirement of 'good cause' can be established by proving ineffective assistance of counsel." *Swain*, 288 Mich App at 631. As used in MCR 6.508(D), "actual prejudice," as relevant to this case, means:

> (i) in a conviction following a trial,

> (A) but for the alleged error, the defendant would have had a reasonably likely chance of acquittal; or

> * * *

> (iii) in any case, the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case;

> (iv) in the case of a challenge to the sentence, the sentence is invalid. [MCR 6.508(D)(3)(b)(*i*)(A), (b)(*iii*) and (b)(*iv*).]

We have previously addressed the arguments on which defendant relies in support of this claim. As explained in Sections II and V, *supra*, trial counsel's failure to retain an expert, object to identification testimony, request an accessory-after-the-fact instruction, and object to the scoring of OV 7 was not objectively unreasonable because those arguments lack merit. Likewise, defendant's arguments regarding the validity of his sentence, as addressed in Sections IV and V, *supra*, and his argument that he is entitled to a new trial because of newly discovered evidence, as addressed in Section VI, *supra*, also lack merit. Thus, appellate counsel's failure to raise these futile arguments on direct appeal was not objectively unreasonable. *Uphaus (On Remand)*, 278 Mich App at 186-187.

As explained in Section III, there is merit to defendant's argument that the trial court improperly questioned him at trial, and that trial counsel erred by failing to object to that questioning. Thus, appellate counsel could have raised those potential viable arguments on appeal. However, defendant cannot demonstrate that he was prejudiced by appellate counsel's failure to raise those arguments because, for the reasons previously discussed, there is not a reasonable probability that the outcome of defendant's appeal would have been different had appellate counsel raised those arguments on direct appeal. Consequently, the trial court did not abuse its discretion by denying defendant's motion for relief from judgment on the basis that appellate counsel was ineffective for failing to raise claims in defendant's prior appeal.

Affirmed.

/s/ Kathleen Jansen
/s/ David H. Sawyer
/s/ Michael J. Riordan

-17-